BOLIN, Justice.
 

 Robert M. Beauchamp, Christopher Jones, and Christy Hotz (hereinafter collectively referred to as “the buyers”) appeal from the trial court’s grant of a motion for a new trial filed by Coastal Boat Storage, LLC, Todd Flanders, and Mark Mallet (hereinafter collectively referred to as “the sellers”) after the jury returned a verdict in favor of the buyers.
 

 Facts and Procedural History
 

 In late March 2005, Coastal Boat obtained a 60-day option to purchase approximately 88 acres of waterfront property in Baldwin County, referred to as the Wolf Bay property, from the Orange Beach Development Company for $2,500,000. Coastal Boat is a limited liability company owned by Flanders and Mallett. The option to purchase was to expire on June 1, 2005. During the option period, Rick Harris, a real-estate agent working on behalf of Costal Boat, offered the Wolf Bay property for sale by contacting several real-estate agents he knew.
 

 In late April or early May 2005, the buyers showed interest in the Wolf Bay property. Christy Hotz is a real-estate agent who works in Birmingham; Christopher Jones is a real-estate developer in Birmingham; and Robert M. Beauchamp is a lawyer licensed to practice law in
 
 *446
 
 Georgia and a real-estate developer. The buyers had been involved in a project to convert the 32d Street Baptist Church located in Jefferson County into condominium units. To effectuate that project, Beauchamp, Hotz, Jones, and Sean Denard had formed a limited liability partnership in Georgia called “Birmingham Design Build, LLP.” Jones sent Beauchamp aerial photographs of the Wolf Bay property. On April 26, 2005, Beauchamp executed a power of attorney authorizing Hotz to act on his behalf, including authorizing her to purchase real property.
 

 On May 20, 2005, Hotz and Jones flew to Baldwin County to view the Wolf Bay property. Harris was present, along with Don Bain, a real-estate agent from Baldwin County who was representing the buyers. That same day, Hotz and Jones signed a purchase agreement, on behalf of Birmingham Design Build, LLP, with Coastal Boat to buy the property. The agreement provided that the closing was set for May 27, 2005, and the purchase price was $4,750,000. The purchase agreement allowed for an additional 30 days following the date of closing to correct any defects in title that could be “readily corrected.” The purchase agreement further provided: “Coastal Boat Storage LLC to retain first 460 feet from Cypress Street then west Perdido Ave. to water’s edge (Wolf Bay). Approx. 5 acres. Parcel #65-03-05-0-000-02500.” Hotz signed a check for $500,000 in earnest money from the account of 32nd Street Baptist Church, LLC, a limited liability corporation, whose members were Beauchamp and Hotz.
 

 On May 21, 2005, Beauchamp viewed the Wolf Bay property. On May 24, 2005, Beauchamp stopped payment on the earnest-money check. That same day, he sent a letter by facsimile to Flanders and Mallet, among others, stating that he believed that everyone involved in the marketing of the Wolf Bay property had misrepresented the amount of land on the Wolf Bay property that was suitable for development. On May 27, 2005, the sellers and agents for Orange Beach Development Company appeared for the closing. The buyers did not appear. On June 1, 2005, Coastal Boat’s option to purchase the property expired and was not renewed.
 

 On October 25, 2005, the sellers sued the buyers, among others, alleging breach of contract and fraud. The sellers dismissed their fraud claim before trial, and the case was tried only on the breach-of-contract claim.
 

 Before the trial began, the sellers filed a motion in limine, seeking to prohibit the buyers from presenting any evidence regarding the number of acres on the Wolf Bay property that were suitable for developing. The sellers asserted that Beau-champ had stated in a deposition that he believed almost all the property was wetlands and not suitable for developing. However, the sellers argued that there had been no expert testimony as to whether the Wolf Bay property was composed mostly of wetlands, and they further argued that the buyers viewed the Wolf Bay property and signed the contract to purchase the property “as is,” without any contingencies, including a wetlands delineation performed by the appropriate expert. The trial court granted the motion.
 

 At the trial, Rick Harris testified that he was familiar with the real-estate market in Baldwin County and that the Wolf Bay property was valuable because it was waterfront property and there was not much undeveloped property left in the area. He testified that another person had entered into an agreement with the sellers to purchase the Wolf Bay property before the buyers did and that that person had included a 30-day “due diligence” contingency clause, but that the buyers’ contract did
 
 *447
 
 not contain any contingencies. Although Harris had not signed a listing-agent agreement with Coastal Boat, he testified that Flanders and Mallett had promised to pay him a commission if the Wolf Bay property sold. Harris testified that 60-foot-long waterfront lots in Baldwin County in May 2005 would have been worth an average of $800,000 to $1,000,000 a piece. Harris testified that, as of the date of trial, the Wolf Bay property had not sold, although he stated that interest in the area had waned after Hurricane Katrina struck the Gulf Coast.
 
 [1]
 

 Beauchamp testified that he had been involved in over 100 real-estate transactions on behalf of his family. He testified that the four members of Birmingham Design Build, LLP, were him, Hotz, Jones, and Denard, and that they were each going to divide any profits they realized from the Wolf Bay property equally. Beau-champ also testified that he originally believed that he was buying a piece of property for less than $5 million that he could “flip” and sell for $15 million. Hotz testified that she was a real-estate agent, and Jones testified that he owns a small business that develops real property and that he had been involved in approximately 50 real-estate transactions.
 

 Dan Blackburn testified that he was an attorney licensed to practice law in Alabama and that most of his practice involved real estate. Blackburn was proffered and admitted as a legal expert in real-estate law and subdivision procedures in the Orange Beach area. Blackburn testified that the City of Orange Beach has subdivision regulations and that he was familiar with those regulations. Blackburn stated that he had reviewed the purchase agreement at issue, along with Coastal Boat’s option contract, that he had reviewed a survey of the Wolf Bay property, and that he had personally inspected the Wolf Bay property. Blackburn testified that under the purchase agreement as written, the proposed transaction constituted a subdivision within the meaning of the Orange Beach subdivision regulations because, under those regulations, any subdivision of land or any division of land, without regard to the number of acres in the parcel, would require that the property be presented to the planning commission to be subdivided. Because Coastal Boat had retained 460 feet of waterfront land on the Wolf Bay property, Blackburn stated, the Wolf Bay property had to be subdivided.
 

 Blackburn testified that under the terms of the purchase agreement, the sellers had 30 days following closing to cure any defect in the title, including the requirement that the Wolf Bay property be subdivided. He opined that the sellers could have obtained timely permission from the planning commission to subdivide the Wolf Bay property because the Orange Beach subdivision regulations included an expedited procedure:
 

 “Q. Alright. Now, would this subdivision [of the Wolf Bay property] keep a closing from occurring?
 

 “A. No, sir.
 

 “Q. Why, not?
 

 “A. Well, a couple of reasons. Orange Beach has a expedited procedure in their subdivision regulations that specifically addresses a situation like this one. It’s for the purpose of dividing one lot into two. And we’re dealing with a 75- or 80-acre tract where there was going to be roughly a 5-acre tract held
 
 *448
 
 out of that. In my opinion, if the parties had been aware of this provision, they could have simply complied with the expedited procedure for dividing one lot into two.
 

 “Q. And would this have qualified for that expedited procedure?
 

 “A. I think it would have.”
 

 Blackburn stated that the planning commission would have approved a request by the sellers to subdivide the Wolf Bay property to carve out the five-acre tract being reserved. He testified that although a planning commission has discretion in zoning and other matters, it has no discretion concerning a “plain vanilla” request for the subdivision of land so long as the minimum requirements are met and that those requirements were met in this case. Blackburn stated that the sellers could have had the property subdivided within the 30 days provided for in the purchase agreement to correct any title defects.
 

 On cross-examination, Blackburn stated that his opinion was based on the Orange Beach subdivision regulations adopted by the Orange Beach Planning Commission in 1991, as revised through January 2007. In a version of the Orange Beach subdivision regulations that included revisions up to December 2001, there was a 30-day filing period in the expedited provisions. The following exchange occurred between Blackburn and the buyers’ counsel:
 

 “Q. All right. If you would, point out the particular subdivision regulation, can you tell if there’s an expedited provision in that particular regulation?
 

 “A. It’s 3.01, where in the later version it’s numbered 3.1. Looks like there is 30-day filing rule in the older version.
 

 “Q. If you would, read that particular section as to the requirements for filing for subdivision with the City of Orange Beach in this particular regulation.
 

 “A. All associated documents must be filed 30 days prior to the second Tuesday of each month for Planning Commission consideration at its regular monthly meeting. The application must be filed so that an advertisement of the proposed subdivision can be posted in four conspicuous locations in the city at least 15 days prior to the public hearing before the Planning Commission, and be published twice a week in a newspaper of general circulation.
 

 “Q. In reading that particular regulation, would it have been possible to have this property subdivided even in the month of June?
 

 “A. I think the question is which version was in effect in 2005.
 

 “Q. Okay.
 

 “A. This one is only good through December 2001.
 

 “Q. My question to you is under this provision, would it have been possible to subdivide this property prior to July of 2005?
 

 “A. Yes. But it would have taken more notice to the Planning Commission than under the later version of the sub-regs.”
 

 Blackburn admitted that he did not know whether the copy of the subdivision regulations that included revisions adopted through January 2007 was in force and effect in May 2005, and that, under the 2001 regulations, it would have been impossible for the sellers to have cured title by having the property subdivided within 30 days following closing as provided for in the purchase agreement. It was never established which version of the Orange Beach subdivision regulations were in place in May 2005.
 

 Blackburn admitted that both the 2001 amendments and the 2007 amendments to the subdivision regulations imposed a fine
 
 *449
 
 if property was sold as subdivided without final approval of the subdivision from the planning commission, and he stated that the regulations carried the same force as state law. He also testified that contracts entered into in anticipation of subdividing property are valid. Blackburn testified that in order to remedy the defect in title (failing to have the Wolf Bay property subdivided), the sellers could have conveyed the entire parcel to the buyers and, at the same time, received a contract from the buyers to sell the sellers the five acres for a nominal amount, and then gotten subdivision approval at a later date. Blackburn admitted that on May 27, 2005, the date set for the closing, there was a defect in the title created by the subdivision regulations. He also stated that there would have been no need to go through the process of subdividing the property so as to provide good title, because the buyers had repudiated the purchase agreement and refused to attend the closing.
 

 Mallett testified that he knew the property had to be subdivided but that he understood that it could be subdivided after the sale. Flanders testified that he did nothing to have the property subdivided and the subdivision approved by the Orange Beach Planning Commission.
 

 On April 13, 2007, the jury returned a verdict in favor of the buyers. On May 1, 2007, the sellers filed a motion to alter, amend, or vacate the judgment or, in the alternative, for a new trial. They argued that the jury’s verdict was contrary to the evidence because, they said, the undisputed evidence established that there was a valid contract among the parties and that the buyers had repudiated the contract; therefore, the sellers were under no duty to subdivide the property. They further argued that the purchase agreement contained no contingencies and that the buyers based their repudiation on alleged fraud regarding the number of acres suited for development, an issue the court removed from the case by granting the motion in limine, not an alleged inability of the sellers to perform under the purchase agreement. The sellers also argued that the trial court erred in not granting their motion for a judgment as a matter of law made at the close of the buyers’ case. On June 14, 2007, the trial court entered the following order:
 

 “Plaintiffs’ May 1, 2007, motion to alter, amend, or vacate the April 13, 2007 order of judgment or, in the alternative, to grant a new trial was argued on June 12, 2007. Upon careful consideration, the court finds that the motion is due to be, and hereby is, granted. The case shall be set for a new trial as to all Defendants.”
 

 Hotz, Jones, and Beauchamp filed separate appeals. Those appeals have been consolidated for the purpose of wilting one opinion.
 

 Standard of Review
 

 In
 
 Jawad v. Granade,
 
 497 So.2d 471 (Ala.1986), this Court established the standard of review it would apply when a party appeals from an order granting a motion for a new trial on the basis that the jury’s verdict was “against the great weight or preponderance of the evidence”:
 

 “[A]n order granting a motion for a new trial on the sole ground that the verdict is against the great weight or preponderance of the evidence will be reversed for abuse of discretion where on review it is easily perceivable from the record that the jury verdict is supported by the evidence.”
 

 497 So.2d at 477.
 

 Where a motion for a new trial is granted for reasons “other than, or in addition to, a finding that the verdict [was] against the great weight or preponderance
 
 *450
 
 of the evidence,” this Court applies a standard of review that is more deferential to the trial court’s determination that a new trial is warranted.
 
 Curtis v. Faulkner Univ.,
 
 575 So.2d 1064, 1065 (Ala.1991). Where a trial court grants a motion for a new trial for grounds other than, or in addition to, that the verdict is against the great weight of the evidence, this Court’s review is limited:
 

 “ ‘It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error.’ ”
 

 Kane v. Edward J. Woerner & Sons, Inc.,
 
 543 So.2d 693, 694 (Ala.1989) (quoting
 
 Hill v. Sherwood,
 
 488 So.2d 1357, 1359 (Ala. 1986)).
 

 Discussion
 

 The first issue that must be addressed is which standard of review should be applied to the trial court’s order granting the sellers’ motion for a new trial. The buyers contend that the only ground stated in the sellers’ motion for a new trial was that the verdict was against the great weight of the evidence, and, they argue, because the trial court did not state a reason for granting the motion, this Court must apply the standard set out in
 
 Jawad, supra.
 
 The sellers contend that because a trial court has the inherent power to grant a motion for a new trial on its own, the trial court could have determined that the buyers’ continued violations of the motion in limine prohibiting the parties from mentioning the condition of the land warranted a new trial.
 

 In
 
 Scott v. Farnell,
 
 775 So.2d 789 (Ala. 2000), the plaintiff filed a motion for a new trial on the sole ground that the verdict was against the great weight of the evidence, and the trial court granted the motion. This Court applied the standard set out in
 
 Jawad
 
 because the plaintiff did not state any other ground in her motion for a new trial. Because the sellers stated no ground other than that the verdict was against the great weight of the evidence, we apply the standard of review set out in
 
 Jawad.
 
 In reviewing the trial court’s decision, we “must review the evidence in the light most favorable to the prevailing party and must indulge all reasonable inferences the jury was free to draw.”
 
 Floyd v. Broughton,
 
 664 So.2d 897, 900 (Ala.1995). Based upon the foregoing, we must determine whether it is “easily perceivable” from the record that the jury verdict in favor of the buyers is supported by the evidence when that evidence is viewed in the light most favorable to the buyers and indulging all reasonable inferences that the jury was free to draw.
 

 In order to establish a breach of contract, the sellers had to show “ ‘(1) the existence of a valid contract binding the parties in the action, (2) [their] own performance under the contract, (3) the defendants’] nonperformance, and (4) damages.’ ”
 
 State Farm Fire & Cas. Co. v. Slade,
 
 747 So.2d 293, 303 (Ala.1999) (quoting
 
 Southern Med. Health Sys., Inc. v. Vaughn,
 
 669 So.2d 98, 99 (Ala.1995)). In
 
 Winkleblack v. Murphy,
 
 811 So.2d 521, 529 (Ala.2001), a plurality of this Court stated, and we agree, that “in order to establish that a defendant is liable for a breach of a bilateral contract, a plaintiff must establish that he has performed, or that he is ready, willing, and able to perform under the contract.” See also
 
 Moss v. King,
 
 186 Ala. 475, 65 So. 180 (1914) (holding that the plaintiff must show his readiness and ability to perform under the contract, even
 
 *451
 
 when the defendant has repudiated the contract).
 

 The sellers presented undisputed evidence of the existence of a valid contract, nonperformance by the buyers, and damages. The question is whether it is easily perceivable from the record that the sellers were ready, willing, and able to perform under the purchase agreement. The sellers presented the testimony of Dan Blackburn, an expert in real-estate law in the Orange Beach area. Blackburn originally testified that the sellers could comply ■with the Orange Beach subdivision regulations and could have had the Wolf Bay property subdivided within the 30-day period following closing provided in the purchase agreement to correct any defects in title. However, Blackburn admitted that the subdivision regulations he was interpreting included amendments up to 2007. He also admitted that under the subdivision regulations that included amendments only through 2001 there would not have been enough time for the sellers to have the Wolf Bay property subdivided within the 30-day period provided in the purchase agreement. Under the particular facts of this case, this created a question for the jury as to which subdivision regulations were in place in May 2005. Because it is easily perceivable from the record that the jury could have determined that the subdivision regulations that included the amendments through 2001 were in operation in May 2005, then there is evidence in the record to support the jury’s verdict in favor of the buyers. That is, there is evidence from which the jury could have determined that the sellers were not ready, willing, and able to perform under the purchase agreement because there was insufficient time for them to have the property subdivided within 30 days after the closing, the period provided for in the purchase agreement to correct any defect in title. It was the jury’s job to consider the conflicting evidence from the sellers and the buyers, and its conclusion that the sellers were not ready, willing, and able to perform was easily perceivable from the record.
 

 The sellers argue that when Beauchamp stopped payment on the earnest-money check and notified the parties that he believed there had been a misrepresentation as to the amount of land on the Wolf Bay property that was suitable for development, he repudiated the purchase agreement and his repudiation excused the sellers of their obligation to prove that they were ready, willing, and able to perform. The general rule with respect to repudiation is that when one party repudiates a contract, the nonrepudiating party is discharged from its duty to perform.
 
 HealthSouth Rehab. Corp. v. Falcon,
 
 799 So.2d 177 (Ala.2001). However, the nonre-pudiating party cannot recover damages for the repudiation of the contract if he was unable to perform his obligation. See
 
 Restatement (Second) of Contracts
 
 § 254 (1981) (“A party’s duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise.”); see also 9 A. Corbin,
 
 Corbin on Contracts
 
 § 978, at 818-19 (Interim ed. 2002) (“In an action for breach by an unconditional repudiation it is still a condition precedent to the plaintiffs right to a judgment for damages that he should have the ability to perform all such conditions. If he could not or would not have performed the substantial equivalent for which the defendant’s performance was agreed to be exchanged, he is given no remedy in damages for the defendant’s non-performance or repudiation. Of course, the willingness and ability that remains a condition precedent in spite of the defendant’s repudiation, is willingness and ability to perform if
 
 *452
 
 there had been no repudiation. The defendant’s wrongful repudiation justifies the plaintiff in taking him at his word and at once taking steps that may make subsequent performance impossible. The willingness and ability to perform need not continue after the repudiation; it is merely required that they should have existed before the repudiation and that the plaintiff would have rendered the agreed performance if the defendant had not repudiated.”). In short, if the nonrepudiating party was incapable of performing anyway, then he cannot recover damages for the repudiation.
 

 In Moss
 
 v. King,
 
 186 Ala. 475, 482, 65 So. 180, 182-83 (1914), this Court stated:
 

 “It is the theory of plaintiff, however, that the allegation of defendants’ complete repudiation of the contract, without giving plaintiff a reasonable opportunity to comply with his obligations thereunder, dispenses with the otherwise necessary allegation of plaintiffs readiness and ability to perform.
 

 [[Image here]]
 

 “But we are aware of no authority which holds that the plaintiff need not show his readiness and ability to perform, even when the defendant has repudiated the contract. On the contrary, affirmative authority is not lacking.
 

 “In an action for damages for breach of an agreement to sell and deliver flour, with the allegation that the defendant refused to comply with his contract and refused to ship the flour, an instruction to the jury that, ‘there being no evidence before them that plaintiff had offered to pay, or was able to pay, for the flour, before bringing this suit, they must find for the defendant,’ was held correct. ... There was no objection to the complaint for omitting the allegation of ability to perform, but proof of it was held essential.”
 

 (Citations omitted.) In the present case, there was evidence indicating that the sellers could not have performed their contractual obligations even if Beauchamp had not repudiated the purchase agreement.
 

 Because the jui-y’s verdict was not against the great weight or preponderance of the evidence, we conclude that the trial court erred in granting the sellers’ motion for a new trial. We reverse the order granting a new trial and remand the cause for the trial court to vacate that order.
 

 REVERSED AND REMANDED WITH DIRECTIONS.
 

 COBB, C.J., and LYONS, STUART, and MURDOCK, JJ., concur.
 

 [1]
 

 . Hurricane Katrina was a devastating hurricane that made landfall on the Gulf Coast as a category 3 hurricane.