BOLIN, Justice.
Ankor Energy, LLC, and Ankor E&P Holdings Corporation (hereinafter referred *800 to collectively as "Ankor") appeal from the Escambia Circuit Court's grant of a motion for a new trial in favor of Jerry M. Kelly, Sr., Kandace Kelly McDaniel, Kelly Properties, LLP, and K&L Resources, LLP (hereinafter collectively referred to as "the Kellys"). The Kellys filed a cross-appeal in the event the order granting the motion for a new trial was reversed, arguing that the motion for a new trial was due to be granted on an alternative ground.
Facts and Procedural History
In 2010, Renaissance Petroleum Company, LLC, drilled two oil wells in Escambia County. The wells were known as the Craft-Blackstone 17-5 well ("the 17-5 well") and the Craft-Huxford 18-2 well ("the 18-2 well"). The wells were part of Renaissance's larger project involving over 100 oil and gas leases and ultimately more than a dozen wells. The Kellys own property in Escambia County and entered into two leases with Renaissance. The leases included property near the two wells.
In December 2010, Ankor acquired an interest in Renaissance's project and leases in Escambia County, including the 17-5 well and the 18-2 well. In January 2011, Renaissance and Ankor petitioned the Oil and Gas Board ("the Board") to establish production units for the two wells. A production unit is the maximum area that can be efficiently and economically drained by a particular well. In February 2011, the Board held a hearing to determine what property to include in the production units. The Kellys were represented by counsel at the hearing and argued that their property should be included in the production units. On February 18, 2011, the Board established the production units for the two wells but did not include the Kellys' property. Renaissance continued to operate the project until May 2011, when Ankor took over operations.
In December 2011, Ankor offered to request that the Board include the Kellys' property in the production units. Ankor took the position that it had not drained any oil from the Kellys' property, and Ankor offered to pay royalties to the Kellys but only after the date the Board included the Kellys' property in the production units. The Kellys did not accept the offer.
On February 3, 2012, the Kellys sued Ankor, among others, alleging breach of contract, negligence, wantonness, breach of an implied covenant to develop, breach of an implied covenant to protect from drainage, fraudulent drainage, and tortious breach of implied legal duties.[1] Specifically, the Kellys alleged that Ankor failed to include their property in the production units presented to the Board, knowing that their property should have been included. They further argued that they suffered a permanent loss of their oil and gas by Ankor's production and capture of oil and gas from adjacent property, thereby draining oil and gas from the Kellys' property. They asserted that the affirmative acts of Ankor, as the Kellys' lessee, caused drainage of their premises and a substantial depletion or destruction and/or impairment in value of the Kellys' oil and gas interest. With the permission of the court, the Kellys later filed a "restated" amended complaint under seal. The Kellys alleged that the restated complaint contained references to confidential Ankor documents and, pursuant to earlier trial court orders, had to be filed under seal. Ankor filed a motion to strike the restated complaint on several grounds, including arguing that the restated complaint added a new claim alleging waste.
*801 In response, the Kellys argued that "waste" in the oil and gas industry refers to operational losses in oil and gas either from surface loss, destruction of the oil and gas, or underground loss. They argued that their original complaint included a claim alleging waste in that they alleged Ankor had a duty to "do nothing to impair" the value of their leases and to use reasonable care to protect the Kellys from drainage or loss by an affirmative act. The Kellys argued that as a proximate result of Ankor's breach of its legal duty not to impair the value of the Kellys' oil and gas interest and its legal duty to use reasonable care to protect the Kellys from drainage or depletion or destruction of their oil and gas interests, Ankor had committed waste. The trial court denied the motion to strike the restated complaint.
At trial, the Kellys withdrew certain of their claims, and the trial court ultimately charged the jury on breach of implied covenants arising under the lease agreements, fraud, wantonness, and waste. The jury returned a verdict in favor of Ankor on all claims. The Kellys filed a motion for a new trial. In their motion, the Kellys alleged, among other things, that a juror had disregarded the trial court's instruction regarding independent research of the issues. The Kellys attached a handwritten affidavit from a juror in which the juror admitted that she had looked in the online Schlumberger Oil Field Dictionary to become familiar with the phrases she heard in testimony such as "Smackover," "How oil migrates," "reservoirs," and "rock formation." In her affidavit, the juror stated that she did not share the results of her online search with other jurors, but that she did use the information to help her understand the proceedings and to help make her decision. The juror signed the affidavit. Counsel for the Kellys notarized the juror's handwritten affidavit.
In response, Ankor filed a motion to strike the juror's handwritten affidavit, arguing that it was an impermissible attempt to impeach the jury's verdict. Ankor further argued that, even if the trial court considered the handwritten affidavit, there was no showing of prejudice to the Kellys. It argued that the handwritten affidavit was silent as to whether this juror would have been inclined to rule in favor of the Kellys had she not considered the meanings of the searched terms. Ankor also argued that, because the juror did not share the information with the other jurors, the search could not have affected the other jurors' decisions.
The Kellys filed a supplemental response, arguing that the terms searched by the juror online were crucial to the issues of waste and drainage. Both parties presented expert testimony on the question of oil migration, and the oil at issue was found in Smackover rock. The Kellys argued that the online search was presumptively prejudicial because those oil-industry terms are not within the knowledge of most jurors. They further argued that the exposure of one juror to extraneous information warrants a new trial.
Ankor filed a supplement to its motion to strike. It argued that the juror's affidavit was not a properly sworn statement. It argued that, because to be guilty of perjury the affiant must be properly sworn, the juror could not be convicted of perjury and that, therefore, the document she signed was not a properly sworn statement.
Ankor attached a second affidavit from the juror in which she stated that counsel for the Kellys had called her numerous times and that she finally had agreed to meet counsel at a McDonald's fast-food restaurant. She further stated that, at the time she signed her statement, she was not swearing to the contents of that statement nor was she aware that it would be "labeled"
*802 an affidavit. The juror stated: "At the time I wrote and signed my statement, I was not placed under oath, and I was not swearing to its contents. I have never sworn to the contents of the statement."
In response, the Kellys filed an affidavit from counsel regarding his meeting with the juror at McDonald's. Counsel alleged that he had drafted an affidavit for the juror to sign based on several telephone conversations. He stated, however, that, after meeting at McDonald's, the juror disclosed that she had looked up additional terms and disclosed how she had used that information. Counsel alleged that, instead of having the juror sign the prepared affidavit, he asked the juror to write an affidavit to include the new information. Counsel stated, in pertinent part:
"During our meeting at McDonalds, Mrs. [M.] asked me if she would get in trouble for what she did. I told Mrs. [M.] that I did not think she would personally get in trouble, but I have a duty to represent my client and let the Court know what happened. Mrs. [M.] told me something to the effect that 'I do not have anything to hide because that is the truth. I looked those terms up.'
"I do not understand how Mrs. [M.] did not know she was giving an affidavit because I let her know that was the entire reason I was immediately dropping what I was doing and driving straight to Brewton.
"I also do not understand how Mrs. [M.] did not know that her affidavit would be filed with the Court. I told Mrs. [M.] that once she gave me her affidavit, she would probably be contacted by Ankor's attorneys to ask her about the substance of her affidavit. Further, I called Mrs. [M.] before we filed her affidavit to give her a 'heads-up' that we were filing it and that she would probably be getting calls from Ankor's attorney very soon. Mrs. [M.] never told me to not file her affidavit. I also called Mrs. [M.] either the day of or the day after the June 21 hearing to let her know that we just had a hearing about her affidavit, and she should expect a phone call from the Ankor attorneys. Mrs. [M.] told me that Ernie White had already called her. Again, Mrs. [M.] did not express any surprise that I filed the affidavit with the Court.
"....
"Although it appears there must have been a misunderstanding between Mrs. [M.] and I about her affidavit, I note that Mrs. [M.] has never denied the substance of her affidavit. She repeatedly admitted to me (twice on the phone and once in writing) that she looked up technical terms to help her in her jury deliberations in clear violation of this Court's instructions.
"Finally, with respect to any issue of the validity of my notarial seal, I specifically asked Mrs. [M.] if I could sign her affidavit when I got back to my office because in my haste to get to Brewton I left my seal in Fort Payne. Mrs. [M.] gave me permission to do so. I can further attest that Mrs. [M.], whose name is signed to the affidavit, was known to me after two weeks of trial, and was the same individual I saw everyday in the courtroom, and as an officer of the Court I again verify the validity of her signature, her identity and the contents of her affidavit."
Subsequently, Ankor filed a third affidavit from the juror. In that affidavit, which was signed by the juror, she stated that she attempted to look up certain terms on her cellular telephone but that she obtained very little information from the search. The juror stated that no other jurors were present when she conducted her search. She further stated that none of *803 the information she viewed motivated her to decide her verdict in any particular way. Following a hearing, the trial court denied the motion to strike the juror's original handwritten affidavit and granted the motion for new trial, stating:
"[The Kellys] sued the Ankor Defendants for drainage and waste of substantial amounts of oil allegedly located under the [Kellys'] property and resulting from the Defendants' operation of the Craft- Blackstone 17-5 No. 1 Well. In brief, the [Kellys] owned acreage immediately adjacent to the 17-5 well. The [Kellys] claimed that the Ankor Defendants' operation of the 17-5 well drained the [Kellys'] lands of oil. This claim was based on the [Kellys'] leases with the Ankor Defendants. At all times relevant to the proceedings, the [Kellys] were under lease with the Ankor Defendants.[1] The [Kellys] also claimed that the Ankor Defendants' operation of the 17-5 well resulted in the waste of the [Kellys'] ability to produce their rightful share of oil from their own lands, the [Kellys'] waste claim was brought under Alabama's oil and gas statutes, specifically, Ala. Code (1975) §§ 9-17-1(a), 9-17-2, 9-17-11, and 9-17-19(a). The case was tried for two full weeks, and the jury heard highly technical testimony from Ankor engineers and geologists, expert testimony from both parties, the [Kellys], and the representative of a party that settled with [Kellys] on a pro tanto basis prior to trial. At the close of the evidence, the [Kellys'] case was submitted to the jury on breach of contract, wantonness, [fraud], and waste claims. After deliberation, the jury returned a verdict in favor of Ankor.
"Under Ala. R. Civ. P. 59(a), a new trial may be granted 'for any of the reasons for which new trials have heretofore [before the adoption of the Alabama Rules of Civil Procedure] been granted in actions at law.' '[T]he rule makes no change in the grounds for a new trial, and prior Alabama decisions must be consulted to determine when a motion under this rule should be granted.' Id., Committee Comments on 1973 Adoption. Therefore, the adoption of Rule 59 did not change the grounds for new trial, and decisions that came before the adoption of the Rules are still good law when considering motions for new trial. Ala. Code § 12-13-11 (1975) provides in pertinent part as follows:
" '(a) On motion filed within 30 days from entry of judgment, a new trial may be granted for the following grounds:
" '(1) Irregularity in the proceedings of the court, jury or prevailing party, or any order of the court, or abuse of discretion, by which the party was prevented from having a fair trial.
" '(2) Misconduct of the jury or prevailing party.
"....
" '(4) Excessive or inadequate damages.
" '(5) Error in the assessment of recovery, whether too large or too small where the action is upon a contract or for the injury or detention of property.
" '(6) The verdict or decision is not sustained by the great preponderance of the evidence or is contrary to law.
" '(7) Error of law occurring at the trial and properly preserved by the party making the application.'
"When the Court concludes that 'the verdict fails to do justice between the parties, [it] not only has the right, but the duty to set aside the verdict and grant a new trial.'
*804 City of Union Springs v. Evans, [286 Ala. 412, 414,] 240 So.2d 662, 664 (Ala. 1970). 'The power of the trial court to grant a motion for new trial is an inherent power that exists to prevent irreparable injustice, and this power is granted by statute. The granting of a new trial does not deprive a party of his right to trial but rather insures it.' Spann v. Marine, 372 So.2d 360, 361 (Ala. Civ. App. 1979).
"The [Kellys] raise several grounds in support of their motion for new trial. The first, and only argument that the Court deems proper to consider is the [Kellys'] argument that juror misconduct in this case warrants a new trial. The other arguments that are presented are found to be insufficient upon which to grant a new trial.
"In regard to the [Kellys'] first argument alleging juror misconduct, the Court notes that for two weeks, this Court repeatedly charged the jury that the jury should not conduct independent research of the issues and matters involved in this case. The Court told the jurors repeatedly, at least 20 or more times, to do no Googling,[2 ] no internet searches, no independent searches of any kind, do not drive by the location of the oil well, do not talk to anyone else about the case and if they did that it could possibly cause any verdict to be thrown out and a new trial would be granted. Further, at almost every break during trial and at the end of each day's testimony, the Court specifically instructed the jurors not to conduct online research of such matters.
"Despite the Court's instructions Juror [M.M.] failed to follow the Court's instructions. In Ms. [M.'s] June 13, 2016 handwritten affidavit, Ms. [M.] testified as follows:
" 'My name is [M.M.] and I was one of the Jurors in the Kelly v. Ankor case. I was not very familiar with the terms used during the trial. To make sure I understood what everyone was talking about I looked in the Schlumberg [sic] Oil Field Dictionary. I looked up phrases such as Smackover, how oil migrates, resivoirs [sic], rock formation. I did this on my phone to help me get familiar with different meanings. I did not share the information I found with any other jurors. But I did use the information to help me understand the proceedings better to help me make my decision.'
"There is no question that the terms looked up by Ms. [M.] -- Smackover, how oil migrates, reservoirs, rock formation -- are highly technical terms.[2] Nor is there any question that those terms involved the principal issues in the case. The jury was called on to determine, in part, where the reservoir was located under the [Kellys'] property, how and if oil had migrated from the [Kellys'] property, and the extent of the Smackover rock formation under the [Kellys'] property. Those are the very terms [M.M.] undertook to research, and, in this case, it would be difficult to imagine more prejudicial terms for a juror to research extraneously. Indeed, [the Kellys'] proof and Defendants' defenses turned on abstract definitions offered by the parties' experts where such definitions attempted to illustrate or explain substances and events found miles beneath the Earth's surface. Even with the aid of seismic data and other pertinent information, the parties can only describe the events in abstract terms with interpretations of highly technical data. Present technology does not permit the actual viewing of the oil and gas in place and *805 migrating miles beneath the Earth's surface. Accordingly, both the liability and damage issues in the case turned on the very definitions that Ms. [M.] researched. In those circumstances, it is difficult for the Court to presume that Ms. [M.'s] extraneous research into those very terms and definitions did not influence her decision, precisely as she testified in her first affidavit.[3] At the least, the Court, the [Kellys] and the Defendants were entitled to know that Ms. [M.] had looked up such technical definitions, to challenge those definitions if necessary, or to instruct her to ignore them. The Court and the parties were denied those opportunities.
"Defendants have countered the [Kellys'] affidavit of the said juror by presenting subsequent affidavits from the juror. The Court has previously ruled against striking the juror's first affidavit and sees no reason to change that ruling in this Order. Furthermore, the Defendants by way of their two submitted affidavits actually confirm to this Court the alleged juror misconduct.
"In Whitten v. Allstate Ins. Co., 447 So.2d 655 (Ala. 1984), the Supreme Court articulated the rule for grants of new trial resulting from juror misconduct as follows:
" 'Juror misconduct will justify a new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law.'
"In Ex parte Arthur, 835 So.2d 981 (Ala. 2002), the Alabama Supreme Court considered the plaintiff's argument in an automobile accident that a juror conducting 'outside medical research' into causes of migraine headaches amounted to prejudice as a matter of law. The trial court denied the plaintiff's motion for new trial, the Court of Civil Appeals affirmed without opinion, and the Alabama Supreme Court granted certiorari review to address, inter alia, the plaintiff's claims of presumed prejudice.
"The Supreme Court wrote that 'to establish their claim of presumed prejudice, the [appellants] must prove that, as a matter of law, "consideration of the extraneous facts was crucial in resolving a key material issue in the case," such that it should be presumed to have prejudiced the jury.' The Alabama Supreme Court noted that 'extraneous information about migraine headaches found in a medical textbook is not the type of common knowledge we expect jurors to bring to deliberations....' Noting that 'neither the parties nor the court had an opportunity to challenge [the extraneous information] or state that it should be ignored,' the Supreme Court held that the 'medical information is the same type of authoritative information as is a dictionary definition of a legal term that is central to the case, or a specific statistic about average medical-malpractice damages in a medical malpractice case, and it has a high probability of influencing jurors' beliefs on scientific issues.' The Supreme Court then held that the juror's research into the causes of migraine headaches was prejudicial as a matter of law.
"The Court has carefully considered all of the arguments advanced by the [Kellys] and Defendants. The Court is of the opinion that the verdict fails to do justice between the parties. Accordingly, the [Kellys'] Motion for New Trial is hereby granted.
"[1] The fact that the [Kellys] were under lease with the Ankor Defendants makes this case distinguishable from [ Phillips Petroleum v. Stryker, 723 So.2d 585 (Ala. 1998) ]. In Stryker, the plaintiffs'
*806 leases with Phillips had long expired before the plaintiffs sued Phillips. The Ankor Defendants have raised Stryker in this case, but this Court has rejected that defense. In any event, at trial both Ankor corporate representatives testified that Ankor had a continuing duty to prevent drainage of the [Kellys'] oil.
"[2] The Defendants subsequently submitted two additional affidavits from Ms. [M.]. The additional affidavits are not handwritten, but were obviously prepared by counsel. In the second affidavit, Ms. [M.] claimed that she was unaware her June 13, 2016 handwritten statement was an affidavit. In her third affidavit, Ms. [M.] explained in greater detail the online research she had conducted. But Ms. [M.] also contradicted her earlier, handwritten statement that she used information she learned online to 'help [her] make [her] decision.' In her third affidavit, Ms. [M.] now claims the extraneous information she looked up 'did not motivate [her] to decide my verdict in any particular way.' However, Ms. [M.] never recanted her original statement, that she looked up terms in violation of the Court's standing orders.
"[3] Perhaps the Court should note here that the trial involved a complex subject matter, oil and gas engineering, which certainly was beyond the average knowledge of the jurors. While some lay testimony was taken during trial, the majority of the testimony at trial was from oil and gas engineers or geologists. The testimony from the engineers and geologists, in turn, was based upon thousands of pages of highly technical data (including such items as bottom hole pressures, production data, seismic data, well logs and the like) and interpretations of that data."
Ankor appealed the trial court's grant of the motion for a new trial. The Kellys filed a cross-appeal, arguing, in the alternative, that the trial court erred in denying their motion for a new trial as to the other grounds they offered in support.
Discussion
Ankor's appeal (Case no. 1151269)
Ankor argues that the trial court erred in granting the Kellys' motion for a new trial because, it says, the juror's handwritten affidavit was a "sham" affidavit and should not have been considered. It further argues that counsel's affidavit was not admissible and should not have been considered. Last, Ankor argues that the juror's research did not prejudice jury deliberations.
It is well settled that juror affidavits generally are inadmissible to impeach a jury's verdict. However, an affidavit showing that extraneous facts influenced the jury's deliberations is admissible. HealthTrust, Inc. v. Cantrell, 689 So.2d 822 (Ala. 1997). Rule 606(b), Ala. R. Evid., provides:
"(b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or *807 evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. Nothing herein precludes a juror from testifying in support of a verdict or indictment."
Here, the juror's first, handwritten affidavit comes within the extraneous-information exception to Rule 606(b) because the juror stated that she researched scientific terms peculiar to the oil industry to help her better understand the terms and that that research assisted her in making her decision.
We must now determine whether the trial court exceeded its discretion in not striking the juror's handwritten affidavit.[3]
" '[T]he trial court has great discretion in determining whether evidence ... is relevant and whether it should be admitted or excluded.' Sweeney v. Purvis, 665 So.2d 926, 930 (Ala. 1995). When evidentiary rulings of the trial court are reviewed on appeal, 'rulings on the admissibility of evidence are within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion.' Bama's Best Party Sales, Inc. v. Tupperware, U.S., Inc., 723 So.2d 29, 32 (Ala. 1998), citing Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165 (Ala. 1991)."
Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 71 (Ala. 2001).
An "affidavit" is defined as: "A voluntary declaration of facts written down and sworn to by a declarant, usu. before an officer authorized to administer oaths." Black's Law Dictionary 68 (10th ed. 2014). " 'The true test of the sufficiency of a paper as an affidavit is the possibility of assigning perjury upon it if false. To meet this test it must be sufficient both in form and in substance.' 1 Ency. Pl. & Pr. 310; 2 Cyc. 22; Hyde v. Adams, 80 Ala. 111 [ (1885) ]." Sellers v. State, 162 Ala. 35, 39, 50 So. 340, 341 (1909).
In the present case, there is nothing to indicate that the juror actually swore to the contents of the handwritten affidavit. Based on the juror's second affidavit and counsel's affidavit, it does not appear that the juror was administered an oath or that she was otherwise informed that she was swearing to the truth of the handwritten affidavit. Additionally, it does not appear that counsel added the jurat, indicating when, where, and before whom the affidavit was sworn, until after the juror signed the affidavit. Section 13A-10-108(3), Ala. Code 1975, provides that it is not a defense to perjury that the document was not sworn to if the document contains a recital that it was made under oath, that the declarant was aware of the recital when he or she signed the document, and that the document contains the signed jurat of a public servant to administer oaths.[4] Without the administering of an *808 oath or the recital on the document that it was being made under oath before the juror signed it, the handwritten affidavit was not a sworn document. The trial court exceeded its discretion in denying Ankor's motion to strike the handwritten affidavit. Without the handwritten affidavit, there is nothing to indicate juror misconduct warranting a new trial. That is, the juror's third affidavit states that, although she attempted to look up scientific terms related to the recovery of oil, she obtained very little information regarding the terms and that none of the other jurors were present when she searched for this information. The juror further stated that none of the information she viewed motivated her to decide her verdict in any particular way.
In Whitten v. Allstate Insurance Co., 447 So.2d 655, 658 (Ala. 1984), this Court stated the often quoted rule concerning juror misconduct: "Juror misconduct will justify a new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law." Juror misconduct involving the introduction of extraneous materials warrants a new trial when one of two requirements is met: 1) the jury verdict is shown to have been actually prejudiced by the extraneous material; or 2) the extraneous material is of such a nature as to constitute prejudice as a matter of law. Ex parte Apicella, 809 So.2d 865, 870 (Ala. 2001) (abrogated on other grounds by the United States Supreme Court in Betterman v. Montana, 578 U.S. ----, 136 S.Ct. 1609, 194 L.Ed.2d 723 (2016) ).
Actual prejudice may not be inferred from the exposure to the extraneous material itself and, instead, requires a showing that the exposure motivated the jury or an individual juror to decide in a particular way. Pearson v. Fomby, 688 So.2d 239, 242-43 (Ala. 1997). With respect to prejudice as a matter of law, or "presumed prejudice," this Court has held that prejudice as a matter of law does not arise from "mere exposure to [a] definition." Pearson v. Fomby, 688 So.2d at 245. In Ex parte Apicella, supra, the Court stated that its holding in Pearson "serves to emphasize the limitations of the doctrine of 'prejudice as a matter of law.' " 809 So.2d at 871. The Apicella Court explained:
"Generally, a presumption of prejudice applies only in a case in which the jury's consideration of the extraneous material was ' "crucial in resolving a key material issue in the case." ' Dawson v. State, 710 So.2d 472, 475 (Ala. 1997) (citing Hallmark v. Allison, 451 So.2d 270, 271 (Ala. 1984), and Ex parte Thomas, 666 So.2d 855 (Ala. 1995) )."
809 So.2d at 872. Consideration of the prejudicial effect of extraneous matter has been held to be a "case-by-case determination to be made in light of the particular facts and attending circumstances." Nowogorski v. Ford Motor Co., 579 So.2d 586, 590 (Ala. 1990).
In Ex parte Arthur, 835 So.2d 981 (Ala. 2002), a plaintiff claimed that her migraine headaches had been caused by the impact of a collision between the defendant's vehicle and the vehicle in which the plaintiff was a passenger. The jury awarded the plaintiff minimal damages, and the plaintiff *809 moved for a new trial, asserting that the jury had been improperly influenced by extraneous information. The plaintiff submitted an affidavit from one of the jurors stating that another juror who was a nurse-practitioner student had, during a break in the jury's deliberations, consulted a medical textbook concerning the possible causes of migraine headaches. According to the affidavit, the nurse-practitioner student had been in favor of paying all of the plaintiff's medical bills before he conducted the independent research, but, after learning that migraine headaches can be caused by things other than accident impacts, " 'he agreed with the position that the [plaintiff's] medical bills should not be paid.' " 835 So.2d at 983. This Court held that the information derived from the medical textbook was " 'not the type of common knowledge we expect jurors to bring to deliberations,' " 835 So.2d at 985 (quoting Castaneda v. Pederson, 185 Wis. 2d 199, 215-16, 518 N.W.2d 246, 253 (1994) ), that it " 'was crucial in resolving a key material issue in the case,' " 835 So.2d at 985 (quoting Hallmark v. Allison, 451 So.2d 270, 271 (Ala. 1984) ), and that it was prejudicial as a matter of law.
In the instant case, the juror attempted to look up technical terms peculiar to the oil industry to help her understand those terms. She did so despite being repeatedly warned by the trial court not to conduct any independent research. Experts had discussed those technical terms that were key issues in the case. However, the juror's third affidavit indicates that she obtained "very little information" regarding those terms and that she did not share the extraneous information with any of the other jurors. We will not presume prejudice where, as in this case, there is nothing to indicate that the jury's deliberations as a whole or the juror's individual decision was tainted by the misconduct.
Although the juror's misconduct did not infect the rest of the jury, we recognize that actual prejudice may be shown when the extraneous material motivated one juror to decide a case in a particular manner. Pearson v. Fomby, supra. In her third affidavit, the juror stated that the information she had viewed on her cellular telephone did not motivate her to decide her verdict in any particular way. Here, we cannot say that there was actual prejudice to the Kellys when the juror's handwritten affidavit should have been stricken and, further, when the juror's third affidavit states that the information did not motivate her verdict in any particular way. The trial court exceeded its discretion in granting the new-trial motion alleging juror misconduct absent an admissible juror affidavit indicating that her misconduct was prejudicial. See Beauchamp v. Coastal Boat Storage, LLC, 4 So.3d 443, 450 (Ala. 2008) ("Where a trial court grants a motion for a new trial for grounds other than, or in addition to, that the verdict is against the great weight of the evidence, this Court's review is limited: ' "It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error." ' Kane v. Edward J. Woerner & Sons, Inc., 543 So.2d 693, 694 (Ala. 1989) (quoting Hill v. Sherwood, 488 So.2d 1357, 1359 (Ala. 1986) )."). Accordingly, we reverse the trial court's order granting a new trial based on juror misconduct.
The Kellys' cross-appeal (Case no. 1160476)
We now turn to the Kellys' cross-appeal, in which they argue that the trial *810 court erred in failing to grant a new trial on the ground that the verdict on their waste and contract claims was against the great weight of the evidence. The Kellys also argue that a new trial should be granted on the basis that the trial court erred in allowing Ankor to present a previously undisclosed opinion from one of its experts. We note that the trial court granted the motion for a new trial on only the juror-misconduct issue, stating that "[t]he other arguments ... are found to be insufficient upon which to grant a new trial," implicitly denying the Kellys' request on these grounds.
In Lloyd Noland Hospital v. Durham, 906 So.2d 157, 168-69 (Ala. 2005), this Court said:
"The standard of review of an order denying a new-trial motion on the ground that the verdict is against the weight of the evidence is well established. 'No ground for reversal of a judgment is more carefully scrutinized or rigidly limited than the ground that the verdict of the jury was against the great weight of the evidence.' Christiansen v. Hall, 567 So.2d 1338, 1341 (Ala. 1990). 'A jury verdict is presumed correct, and this presumption is strengthened by the trial court's denial of a motion for new trial.' Med Plus Props. v. Colcock Constr. Group, Inc., 628 So.2d 370, 374 (Ala. 1993).
" ' "Moreover, the denial of a motion for a new trial [on the ground that the verdict is against the weight and preponderance of the evidence] will not be reversed by this Court unless, after allowing all reasonable presumptions as to the verdict's correctness, the preponderance of the evidence is so against it that this Court is clearly convinced that it is wrong and unjust." '
" 628 So.2d at 374 (quoting Deal v. Johnson, 362 So.2d 214, 218 (Ala. 1978) ). The denial of such a motion ' "rests within the sound discretion of the trial court, and this Court will not reverse a ruling in that regard unless it finds that the trial court's ruling constituted an abuse of discretion." ' Vaughan v. Oliver, 822 So.2d 1163, 1170 (Ala. 2001) (quoting Colbert County-Northwest Alabama Healthcare Auth. v. Nix, 678 So.2d 719, 722 (Ala. 1995) )."
The Kellys argue that the great weight of the evidence supports their waste claim because Ankor's chief reservoir engineer admitted that Ankor's operation of the 17-5 well resulted in the Kellys' property having little or no value. With regard to their contract claim, the Kellys argue that it was undisputed that they had a lease with Ankor in February 2011 and that Ankor excluded the Kellys' property from its request to the Board to establish production units in February 2011, despite indications that there was oil on the Kellys' property. The Kellys fail to cite authority regarding the great-weight-of-the-evidence standard and fail to explain why the jury's verdict was against the great weight of the evidence. " 'When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court's duty nor its function to perform an appellant's legal research.' City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala. 1998)." Kennedy v. Boles Invs., Inc., 53 So.3d 60, 74 (Ala. 2010).
Last, the Kellys argue that the trial court erred in allowing Ankor to present a previously undisclosed opinion by its expert, Ken Hanby. At trial Hanby was asked: "In 2010 when the 17-5 well was first drilled, was there any recoverable oil underneath Section 8 that was in communication *811 with the 17-5 and the 18-2 well?" The Kellys timely objected to the testimony. The following exchange occurred at trial:
"[Ankor's counsel]: In 2010 when the 17-5 well was first drilled, was there any recoverable oil underneath Section 8 that was in communication with the 17-5 and the 18-2 well?
"[Kellys' counsel]: And I'm going to object to that one. Your Honor. That opinion has not been disclosed.
"....
"[Kellys' counsel]: I'm objecting to the question in 2010. He asked him an opinion about something in 2010 and that opinion has not been disclosed.
"THE COURT: Is that from a document that I just put into evidence?
"[Kellys' counsel]: It's from the defendants' expert.
"[Ankor's counsel]: This is the [Kellys]. This is our expert disclosures. And you'll see those two paragraphs that I've marked, kind of with my fingers there.
"[Kellys' counsel]: That wasn't the question.
"THE COURT: Okay. So your objection is to the form --
"[Kellys' counsel]: He asked the witness in 2010.
"THE COURT: The year 2010.
"[Kellys' counsel]: Yes, sir. But, I mean, he's not given us that opinion. This is -- his opinion is --
"[Ankor's counsel]: His opinion doesn't have a date.
"[Kellys' counsel]: I don't mind that he asks the way it's written.
"THE COURT: So your objection is that he gave it a time date signature of 2010?
"[Kellys' counsel]: Which he's never told us.
"[Ankor's counsel]: Well, of course, the time issue didn't become relevant until the waste claim was added way after all of this discovery was finished.
"THE COURT: I am going to permit the question. I overrule the objection."
In Edwards v. Valentine, 926 So.2d 315, 327 (Ala. 2005), this Court stated:
" '[A] party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.'
" Ala. R. Civ. P. 26(b)(4)(A)(i). In other words, Rule 26 contemplates pretrial disclosure of (1) the identity of an expert witness, (2) the 'subject matter' of his testimony, (3) the 'substance of the facts and opinions,' and (4) a 'summary of the grounds' for his opinion. Moreover, '[a] party is under a [continuing] duty seasonably to supplement [an interrogatory] response with respect to ... the identity of each person expected to be called as an expert witness at trial, the subject matter on which the expert witness is expected to testify and the substance of the witness's testimony.' Rule 26(e)(1)."
In this case, Ankor disclosed during discovery that Hanby would opine, among other things, that, "[e]ven if there were physically some oil in this Smackover structure underneath the [Kellys'] Section 8 property, that oil could not have been produced through the 17-5 or 18-2 wells." The Kellys argue that Hanby should not have been allowed to give his opinion as to whether there was oil under the Kellys' property in 2010. However, the trial court was within its discretion to allow the opinion *812 based on the scope of the expert's disclosure of the subject matter of his testimony. Accordingly, the Kellys were not entitled to a new trial on this ground.
Conclusion
We reverse the trial court's order granting the Kellys' motion for a new trial based on juror misconduct, and we remand the cause to the trial court to reinstate the original judgment entered on the jury's verdict for Ankor. As to the Kellys' cross-appeal, insofar as the order of the trial court granting the Kellys' motion for a new trial denied that motion on the alternative grounds argued by the Kellys, that order is affirmed.
1151269-REVERSED AND REMANDED WITH DIRECTIONS.
1160476-AFFIRMED.
Parker, Main, Wise, Bryan, Sellers, and Mendheim, JJ., concur.
Shaw, J., concurs in the result.
SHAW, Justice (concurring in the result).
I concur in the result in both appeals. I write to discuss the juror's handwritten affidavit submitted by Jerry M. Kelly, Sr., Kandace Kelly McDaniel, Kelly Properties, LLP, and K&L Resources, LLP (hereinafter referred to collectively as "the plaintiffs"), in support of their motion for a new trial.
Generally, juror affidavits cannot be used to impeach a verdict; however, they can be used to show that extraneous information influenced the jury. Rule 606(b), Ala. R. Evid., states:
"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict ... except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention ...."
(Emphasis added.) Rule 606(b) explicitly states that a juror may testify as to whether extraneous information was brought to the jury's attention. Our caselaw has included affidavit testimony within the term "testify" in this situation. See, e.g., Alabama Power Co. v. Turner, 575 So.2d 551, 556-57 (Ala. 1991) ("As a general rule, neither testimony nor affidavits are admissible to impeach a jury's verdict. An exception to this rule exists when an affidavit tends to show extraneous facts that have influenced the jury's deliberations and the resulting verdict." (citations omitted) ).
Ankor Energy, LLC, and Ankor E&P Holdings Corporation (hereinafter referred to collectively as "the defendants") argued below, and restate the argument on appeal, that the handwritten affidavit offered by the plaintiffs in support of their motion for a new trial was not a valid affidavit because, although the signature was notarized, the affidavit was unsworn. Thus, the defendants argue, it was not "testimony" of a juror that could be used to impeach the verdict.
I note that the handwritten affidavit does not have the oft-included opening statement that the writing was made under oath. Instead, as part of the notary's recitations, it states that it was "sworn and subscribed before me." The juror, in a subsequent sworn affidavit, states that such language was not on the affidavit when she signed it, that she was not placed under oath, and that she did not intend the statement to be under oath:
"After the trial was over, ... one of the Plaintiffs' attorneys ... called me over a dozen times, on both my cell phone and my mother's landline telephone. I do not know how he obtained these phone numbers. [Plaintiffs' counsel] was trying to convince me to provide him a statement *813 that I had looked up information concerning the trial on my phone. Finally, in an attempt to stop the harassing phone calls I was receiving from [Plaintiffs' counsel], I decided to meet him at McDonald's [fast-food restaurant] in Brewton and give him a statement. At that time, I did no[t] know that my statement would be used in Court.
"... At the time I wrote and signed my statement, I was not placed under oath, and I was not swearing to its contents. I have never sworn to the contents of the statement.
"... The language at the bottom of the version of my statement which was filed in Court which says 'Sworn to and subscribed before me ...' was not on the document at the time I signed my statement. In addition, the word 'Affidavit' was not on the document at the time I signed my statement.
"....
"... At the time I wrote my statement, I did not believe I was swearing to its contents or that it would be labeled an affidavit."
An affidavit by the counsel for the plaintiffs who took the juror's affidavit indicated that he notarized her affidavit at a later time because he forgot to bring his notary seal to the meeting. He did not indicate that the juror was acting under oath. It is also clear that the "sworn and subscribed" language, and the word "affidavit" at the top, are in a different handwriting than the rest of the affidavit.[5]
In my opinion, the notarization of the handwritten statement would confirm only that it was signed by the affiant. It does not indicate that the signatory was under oath; subsequent affidavits confirm that the juror did not believe that she was under oath. Thus, it was due to be stricken by the trial court. The defendants may challenge on appeal the trial court's failure to do so; because the defendants objected to the affidavit and moved to strike it in the trial court, the issue whether it was due to be stricken was preserved for appellate review. See Ex parte Secretary of Veterans Affairs, 92 So.3d 771, 777 (Ala. 2012) (holding, in the context of a motion for a summary judgment, that the failure to move the trial court to strike an affidavit waives "any objection on appeal regarding the trial court's consideration of the affidavit"). I believe that the notarized handwritten statement is due to be stricken.
With the affidavit stricken, there was no competent evidence showing that the juror's misconduct resulted in prejudice. Cf. Reed v. State, 547 So.2d 596, 597 (Ala. 1989) ("Once the trial court investigates the misconduct and finds, based on competent evidence, the alleged prejudice to be lacking, this Court will not reverse." (emphasis added) ).[6] Specifically, the only proper "testimony" before the trial court consisted of a later executed, sworn affidavit by the juror submitted by the defendants.[7] This "testimony" indicates that the juror considered an extraneous source but *814 that such consideration did not impact her decision. ("The information I viewed on my cell phone did not motivate me to decide my verdict in any particular way."). Thus, the only testimony before the trial court on this issue showed no "extraneous prejudicial information" for purposes of Rule 606(b) and nothing impacting the verdict. See Pearson v. Fomby, 688 So.2d 239, 242 (Ala. 1997) (" 'Juror misconduct will justify a new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law.' " (quoting Whitten v. Allstate Ins. Co., 447 So.2d 655 (Ala. 1984) ) (emphasis added) ). The evidence supporting the plaintiffs' argument appears, as a matter of law, to be insufficient to warrant a new trial.

Renaissance entered into a pro tanto settlement with the Kellys before trial.

"Googling" is conducting an Internet search using the Google search engine.

Ankor timely objected to the handwritten affidavit and moved to strike it, preserving the issue for appellate review. See generally Ex parte Secretary of Veterans Affairs, 92 So.3d 771 (Ala. 2012) (holding that a party must move the trial court to strike any evidence that violates the requirement that affidavits submitted in support of a motion for a summary judgment be sworn, certified, or otherwise authenticated to preserve the issue).

The Commentary to § 13A-10-108 provides, in pertinent part:
"Subdivision (3) is designed to prevent a person from escaping conviction for perjury simply because the document was not actually sworn to, even though the document contains a recital that it was made under oath. The defendant must have been aware of the recital. The purpose of requiring such awareness is to protect a person from prosecution in cases where he might have inadvertently signed a document, or where the recital was placed on the document without his knowledge. Subdivision (3) will overrule Goolsby v. State, [17 Ala. App. 545, 86 So. 137 (1920) ], and Smith v. State, [18 Ala. App. 45, 88 So. 350 (1921) ], and the requirement that the person who administered the oath must be able to testify positively that the defendant actually swore to the document as recited in the jurat. In other words, an affidavit regular on its face does not have to be supported by the testimony of the public servant whose jurat and signature appear thereon."

It should not be inferred that counsel acted inappropriately in later adding the word "affidavit" to the document or in subsequently notarizing it; instead, this discussion merely describes what the juror says she saw when she signed the document.

This argument was raised by the defendants in the trial court: "Since the [handwritten statement] is not, in fact, an 'affidavit,' Plaintiffs have failed to submit any competent legal evidence in support of the juror misconduct claim contained in their motion for new trial."

The other affidavit by the juror and the affidavit by the notary/plaintiffs' counsel describe the circumstances surrounding the execution of the handwritten statement.